# COURT OF APPEALS OF VIRGINIA

---

### Record No. 1705-24-1

---

KEVIN JEFFERSON

v.

COMMONWEALTH OF VIRGINIA

---

Present: Judges Ortiz, Chaney and Frucci

Opinion Issued May 5, 2026[*]

---

### FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Robert B. Rigney, Judge

(Kristin Paulding; 7 Cities Law, on brief), for appellant.

(Jason S. Miyares,[1] Attorney General; Jennifer L. Guiliano, Assistant Attorney General, on brief), for appellee.

---

### MEMORANDUM OPINION
### PER CURIAM

Following a jury trial, Kevin Jefferson was convicted of malicious or unlawful wounding by mob.[2] He was sentenced to ten years of imprisonment with three years suspended. On appeal,

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

[2] The jury found Jefferson not guilty of using physical force to commit a robbery that did not result in serious bodily injury. Jefferson was also tried for using a firearm in the attempt or commission of a robbery, but the circuit court granted Jefferson's motion to strike the evidence on that charge and it was dismissed.

Jefferson challenges the sufficiency of the evidence to sustain his conviction. For the following reasons, we affirm the circuit court's judgment.[3]

BACKGROUND[4]

In August 2023, J.T.[5] frequently visited the Ocean View Motel in Norfolk to visit his friend, Donner. On several of these visits, J.T. encountered Jefferson. While J.T. and his girlfriend, Tiffany Hughes, were at Donner's motel room on August 16, 2023, J.T. saw a car with a female driver and three male passengers—including Jefferson—enter the parking lot. As the two other men entered the motel, Jefferson addressed J.T. regarding an alleged interaction between J.T. and Jefferson's girlfriend on social media. This confused J.T. because he did not know Jefferson's girlfriend.

As J.T. and Jefferson spoke in the outdoor breezeway near Donner's room, J.T. looked down at his phone. Jefferson then struck J.T. multiple times. As they went to the ground and scuffled, J.T. told Jefferson to "[c]hill" and "let [him] go" because Jefferson was wrong. J.T. had a knife in his back pocket but was unable to reach it. Instead, he dragged Jefferson toward Donner's room so that Hughes could give him the knife she carried.

---

[3] Having examined the briefs and record in this case, the panel unanimously agrees that oral argument is unnecessary because "the appeal is wholly without merit." Code § 17.1-403(ii)(a); Rule 5A:27(a).

[4] "Consistent with the standard of review when a criminal appellant challenges the sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This standard "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[5] We use initials, rather than names, to protect the privacy of victims.

When J.T. and Jefferson were in the doorway, they separated when Jefferson's shirt came off and J.T. pushed him away. Jefferson fled and J.T. took the knife from Hughes. J.T. attempted to retrieve the items that fell from his pockets during the struggle.

Jefferson's brothers, Kailub Jefferson (Kailub) and Khory Jefferson (Khory), ran down from the motel's upper level and confronted J.T. According to J.T., they brandished firearms at him and demanded that he drop the knife, which he did. As J.T. walked across the parking lot away from the building, Kailub and Khory pursued and struck him multiple times, sending him to the ground.

Once J.T. was on the ground, at least six people, including Jefferson, Khory, and Kailub, surrounded him. Jefferson, Khory, and Kailub repeatedly struck him with their hands and feet. J.T. "balled up" to shield himself from the blows as much as possible. Khory removed J.T.'s shirt, and other members of the group took the chains around his neck, his car keys, phone, jewelry, and backpack.

After about one minute, most of the group walked back toward the motel. But Khory climbed on top of J.T. and, using his hands, repeatedly struck J.T. in the head area. Jefferson and Kailub then returned and kicked and stomped J.T. for another 15 seconds. The entire group walked away, but Khory then returned and kicked J.T. several more times as he lay prone at the edge of the parking lot. Khory dragged J.T. up with his hair while Jefferson and Kailub kicked him.

J.T. eventually escaped from Khory's grasp and fled to the condominiums across the street. He kicked open a residence door to seek shelter, and a Norfolk police officer responding to one of several 911 calls about the incident found him in the doorway, seemingly slipping in and out of consciousness. An ambulance transported J.T. to the hospital. According to J.T.'s medical records from that day, he suffered contusions on his head, scalp, and eye, abrasions on his arms, hands, and knees, and abdominal pain.[6]

---

[6] The records indicated that J.T. left the hospital against medical advice.

The Commonwealth charged Jefferson, Kailub, and Khory with robbery, use of a firearm in the commission of a felony, and malicious or unlawful wounding by mob.[7] At the joint jury trial, J.T. acknowledged during his direct examination that he was in federal custody for a probation violation and that he struggled with substance abuse. He asserted that he suffered a concussion and bruised ribs and lost a tooth from the attack. On cross-examination, he acknowledged that the medical records in evidence did not reflect a concussion diagnosis or a missing tooth. He explained that he returned to the doctor on a later date after getting sick at work and then was diagnosed with "post-concussion syndrome." He also stated that his tooth was loosened during the attack and fell out during his next meal. J.T. conceded that he did not tell the Commonwealth about these injuries.

J.T. further acknowledged that Donner was a prostitute and that he and Hughes went to the motel on August 16, 2023, for a sexual encounter with her. J.T. admitted that he and Donner used marijuana and methamphetamine and that he had seen Jefferson sell drugs to her. But J.T. denied that he sought to buy drugs from Jefferson that day.

During its case-in-chief, the Commonwealth played video footage from several of the motel's security cameras. Although the videos lacked sound, they provided the jury a direct view of the initial struggle between Jefferson and J.T. outside Donner's room and the subsequent attack in the parking lot. The initial altercation between Jefferson and J.T. started at 1:13 p.m., and J.T. escaped from Khory's grasp at 1:18 p.m. One of the videos showed a sedan driven by a Caucasian female enter the motel parking lot at 1:23 p.m. Jefferson got in the front passenger seat and the car left. The Commonwealth also played body camera footage from the police officer who encountered J.T. across the street after the assault.

_____

[7] The indictment alleged that Jefferson "did, as part of a mob, maliciously or unlawfully shoot, stab, cut, wound[,] or cause serious bodily injury to" J.T.

A bystander, Jessica Rolley, saw J.T. crawl on his hands and knees from the motel parking lot across the street. She saw a "suspicious contusion" on his chest. Rolley called 911 and remained in the area. At 1:24 p.m., Rolley saw a sedan resembling the one on the video leave the motel parking lot with a female driver and male passenger. The driver asked Rolley "where the individual went." Rolley pointed to the condominium where J.T. had kicked in the door. Rolley heard the driver state that "they were going to fucking kill him this time." When Rolley looked in the vehicle, a long barrel firearm was in the male passenger's lap.

At the close of the Commonwealth's case, each defendant moved to strike the evidence. Jefferson conceded that the Commonwealth established the existence of a mob but asserted that the Commonwealth failed to prove that the mob acted with the requisite intent or that J.T. suffered serious bodily injury. The circuit court took the motions to strike under advisement.

Jefferson testified in his own defense that his mother, Khory, and Kailub lived at the motel in August 2023 and that he often visited them there. Further, Jefferson averred that he had sold illegal drugs to both J.T. and Donner and that J.T. was Donner's pimp.

According to Jefferson, when he arrived at the motel on the afternoon of August 16, 2023, J.T. asked to buy drugs from him, but he refused. When Donner suggested they speak inside the room, Jefferson worried that she and J.T. would "jump" him. As J.T. looked down at his phone, Jefferson "blanked" and struck him with his fists. They wrestled on the ground, and J.T. tried to drag him into the room. Jefferson pulled out of his shirt and felt a sharp object strike him in the face.

Jefferson ran into another motel room that was being cleaned, but the housekeeper ejected him. J.T. then brandished a knife at him and stated: "You're going to die." Jefferson yelled for help. When he entered his mother's room and saw in the mirror that his face was bloodied, he became very angry. He ran to join the fray in the parking lot and kicked and punched J.T.

Jefferson's counsel asked him why he was "so angry" that he went "over a second time" and punched and hit J.T. again. He responded that he knew it was a "no win" situation that was his fault.

Jefferson denied that he intended to kill J.T. or that he took any property from him. He stated that he did not have any weapons that day. Jefferson described the attack as a "blur" and asserted that he did not notice what Kailub and Khory did. He also stated that he went to the hospital for the injuries to his face but left because the wait for treatment was too long.

Khory testified that he was in his mother's motel room when he heard Jefferson yell for help. According to Khory, when he ran downstairs and saw Jefferson bloodied and panicked, he "overreacted" and "hurt" J.T. by punching him in the face with a closed fist. Khory also denied having a firearm that day.

At the close of all the evidence, the defendants renewed their motions to strike. The Commonwealth moved to amend the malicious or unlawful wounding by mob indictments to match the language in Code § 18.2-41 requiring that the Commonwealth prove that the mob did "shoot, stab, cut or wound" the victim, "or by any means cause him bodily injury." The defendants objected to the proposed amendments as untimely and prejudicial, asserting that the Commonwealth was required to prove the higher bar of "serious bodily injury" alleged in the indictments. The circuit court took all pending motions under advisement.

The Commonwealth subsequently withdrew its motion to amend the indictments, conceding that it had to prove its allegation that J.T. suffered "serious bodily injury" even though Code § 18.2-41 required only "bodily injury." The circuit court then denied all motions to strike except regarding Jefferson's charge for use of a firearm in the commission of a felony. The circuit court instructed the jury that to convict Jefferson of malicious or unlawful wounding by mob, the

Commonwealth had to prove that "a member or members of [a] mob caused serious bodily injury by any means to" J.T.

The jury convicted Jefferson of malicious or unlawful wounding by a mob but acquitted him of robbery. Jefferson now appeals, challenging the sufficiency of the evidence to sustain his conviction.

ANALYSIS

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

We defer to the fact finder's credibility determinations unless the witness's testimony is "inherently incredible, or so contrary to human experience as to render it unworthy of belief." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019) (quoting *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011)). In Virginia, this deference, especially as it relates to the fact finder's resolution of conflicting facts and competing inferences, enjoys "the highest degree of appellate deference." *Coleman v. Commonwealth*, 52 Va. App. 19, 23 n.2 (2008). The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Barney*, 302 Va. at 97 (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing

court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

I. Malicious or Unlawful

"Any and every person composing a mob" that "maliciously or unlawfully" shoots, stabs, cuts, or wounds "any person, or by any means cause[s] him bodily injury with intent to maim, disable, disfigure or kill him" is guilty of a Class 3 felony. Code § 18.2-41; *see Commonwealth v. Leal*, 265 Va. 142, 146 (2003). This statute "imposes 'individual liability based on collective act and intent' because 'the mob is the criminal actor.'" *Paiz v. Commonwealth*, 54 Va. App. 688, 697 (2009) (quoting Ronald J. Bacigal, *Virginia Practice: Criminal Offenses and Defenses* 523 (2008-2009)).

Jefferson maintains that the Commonwealth failed to show that he acted with malice. Although the offense codified in Code § 18.2-41 sometimes is referred to as malicious wounding by mob, it "is a different offense from malicious wounding as codified in Code § 18.2-51." *Id.* at 698. Importantly, "[t]he disjunctive term 'or,' which separates the terms 'maliciously' and 'unlawfully'" in Code § 18.2-41 indicates that it "only requires proof that the wounding was unlawful." *Id.* The jury properly was instructed that it could convict Jefferson of this offense if it found that the mob acted unlawfully. Jefferson does not argue that the evidence was insufficient to support such a finding.[8] Accordingly, we need not consider whether the evidence was sufficient to support a finding of malice.

---

[8] Indeed, Jefferson asserts that "[a]ny conviction under this statute should not be" for "malicious wounding by mob" but for "unlawful wounding by mob."

II.  Intent

The Commonwealth also had to prove that the mob collectively intended to "maim, disable, disfigure or kill" J.T.  Code § 18.2-41.  "Intent is a state of mind which can be evidenced only by the words or conduct of the [people] who [are] claimed to have entertained it."  *Brown v. Commonwealth*, 74 Va. App. 721, 733-34 (2022) (quoting *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013)).

"[W]hether the required intent exists is generally a question of fact for the trier of fact." *Northcraft v. Commonwealth*, 78 Va. App. 563, 597 (2023) (alteration in original) (quoting *Brown v. Commonwealth*, 68 Va. App. 746, 787 (2018)).  In determining a defendant's intent, the factfinder may "draw reasonable inferences from basic facts to ultimate facts."  *Fary v. Commonwealth*, 77 Va. App. 331, 349 (2023) (en banc) (quoting *Musacchio v. United States*, 577 U.S. 237, 243 (2016)), *aff'd*, 303 Va. 1 (2024).  The factfinder also may conclude that the defendant "intend[ed] the natural, probable consequences of his . . . actions."  *Id.* at 352 (quoting *Secret v. Commonwealth*, 296 Va. 204, 229 (2018)).  We will not disturb the factfinder's inferences unless they enter "the realm of non sequitur."  *Id.* at 349 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 332 (2018)).

Here, the jury was presented both with J.T.'s testimony and video evidence that demonstrated that Jefferson initiated a physical altercation with J.T. outside Donner's motel room. They scuffled for approximately one minute before separating.  Kailub and Khory then arrived and confronted J.T.; as he walked away, they struck him, and he fell to the ground.  At least six people—including Jefferson, Khory, and Kailub—then surrounded J.T., and Jefferson, Khory, and Kailub repeatedly punched, kicked, and stomped him while on the ground.

A jury hearing this testimony and watching this video could find that the members of the mob—including Jefferson—intended to permanently harm J.T.  The video evidence highlighted the

vicious and gratuitous nature of the attacks. Even after J.T. was on the ground, defenseless and outnumbered, Jefferson, Kailub, and Khory continued to forcefully strike him in the head. A reasonable trier of fact could conclude that the members of the mob, including Jefferson, intended the natural and probable consequences of their collective actions. *Fary*, 77 Va. App. at 352. This inference is strengthened by the fact that, at several points during the attack, each of the defendants walked away from J.T. as he lay prone on the ground at the edge of the parking lot before returning to land additional blows.

Moreover, Jefferson acknowledged on the stand that, after their one-on-one struggle, he attacked J.T. out of anger, not fear. This anger further supports the inference that Jefferson and his confederates intended to permanently injure J.T. Having viewed the video evidence, the jury also was entitled to conclude that Jefferson's testimony was an attempt to conceal his guilt by downplaying the severity of the attack and his intent in participating in it. *See Brown*, 74 Va. App. at 734; *Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018).

Finally, a jury could find from Rolley's testimony that Jefferson and the driver of the vehicle were searching for J.T. after he escaped from the motel. Given Jefferson's possession of a firearm in the vehicle and the driver's statement about killing the person they were looking for, the jury could infer that Jefferson intended to further harm J.T. This inference, in turn, strengthens the conclusion that Jefferson, as a member of the mob that assaulted J.T., intended to inflict permanent harm on him. In short, the Commonwealth's evidence provided an ample basis for the jury to conclude that the mob intended to "maim, disable, disfigure or kill" J.T. Code § 18.2-41.

III. Serious Bodily Injury

The indictment alleged that Jefferson, "as part of a mob" did "shoot, stab, cut, wound[,] or cause serious bodily injury to" J.T. As both parties agreed at trial, Code § 18.2-41, requires that the Commonwealth prove that the mob caused the victim "bodily injury" rather than "serious bodily

injury." But the Commonwealth conceded that, having alleged that the mob caused J.T. serious bodily injury, it was required to prove that more stringent allegation to sustain a conviction under the indictment.

Virginia courts have defined "bodily injury" as "*any bodily hurt* whatsoever." *McGowan*, 72 Va. App. at 518-19 (quoting *Nolen v. Commonwealth*, 53 Va. App. 593, 598 (2009)). A bodily injury is serious if it is "fairly and reasonably . . . deemed not trifling, grave, giving rise to apprehension, giving rise to considerable care, and attended with danger." *Id.* at 519 (quoting *Nolen*, 53 Va. App. at 599).

J.T. testified at trial that he suffered a concussion, bruised ribs, scrapes on his hands and face, and lost a tooth. He stated that, at the time of trial, he experienced continued diminished vision in his left eye. J.T. acknowledged on cross-examination that his emergency room records from the day of the attack did not reflect a concussion diagnosis. He clarified that sometime later he sought medical attention after becoming sick at work. At that time, a doctor diagnosed him with "post-concussion syndrome." J.T. added that his tooth was loosened during the attack and fell out when he ate his next meal.

We conclude that a rational factfinder viewing the evidence in the light most favorable to the Commonwealth could find that the mob inflicted serious bodily injury on J.T. Jefferson does not directly contest that a lost tooth or a concussion could constitute serious bodily injuries.[9] Rather, he asserts that J.T.'s testimony is insufficient to prove those injuries. We disagree. "[N]o Virginia authority . . . requires the testimony of a medical professional or similar expert evidence to

---

[9] As Jefferson notes, in the child abuse statute, the General Assembly defined "serious injury" as including but not limited to "(i) disfigurement, (ii) a fracture, (iii) a severe burn or laceration, (iv) mutilation, (v) maiming, (vi) forced ingestion of dangerous substances, and (vii) life-threatening internal injuries." Code § 18.2-371.1(A). Although Jefferson cites this definition as instructive of what constitutes serious bodily injury, he does not explain why loss of a tooth is not disfigurement or maiming.

show that" the victim suffered bodily injury. *English v. Commonwealth*, 58 Va. App. 711, 720 (2011). The jury was well-positioned to assess J.T.'s testimony that, after being repeatedly struck in the head by multiple people, his tooth loosened and later fell out. Having credited that testimony, the jury could conclude that J.T.'s lost tooth was "not trifling, grave, [and] giving rise to apprehension." *McGowan*, 72 Va. App. at 519.

Likewise, the jury was entitled to credit J.T.'s testimony that a doctor diagnosed him with post-concussion syndrome even without medical records confirming the diagnosis. This testimony is consistent with the responding officer's testimony and body camera footage that J.T. was going in and out of consciousness when the officer encountered him after the attack. Additionally, the jury could consider J.T.'s testimony about his injuries alongside the video evidence and Rolley's testimony regarding the injuries that she observed as he crawled across the street to escape. The jury could conclude that the injuries J.T. described were consistent with the repeated and forceful assaults on him. From all the facts and circumstances, a reasonable finder of fact could conclude beyond a reasonable doubt that J.T. sustained serious bodily injury and that Jefferson was guilty of violating Code § 18.2-41.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed.

*Affirmed.*